MARY WISE, administratrix of WILLIAM WISE, deceased, v. SAMUEL TEERPENNING.

Under the act of 1847, giving to the representatives of a deceased person a remedy by action, where death was caused by wrongful act, neglect or default, the measure of damages is the pecuniary loss which the widow and next of kin have sustained by the death. And, in their verdict, a jury cannot give vindictive damages, nor award any thing as a punishment of the wrong doer, or from sympathy for the loss of the survivors; the standard created by the statute being purely the pecuniary loss.

Such action may be maintained, notwithstanding that the act causing the death is a felony, and the wrong doer has not yet been tried therefor.

THIS was an action brought pursuant to a statute passed December 13, 1847, which enacted that whenever the death of a person shall be caused by wrongful act, neglect or default, and the act, neglect or default, is such as would—if death had not ensued—have entitled the party injured to maintain an action, and recover damages in respect thereof, the person or corporation which would have been liable if death had not ensued, shall be liable to an action for damages, notwithstanding the death of the person injured; and although the death shall have been caused under such circumstances as amount, in law, to felony. Such action to be brought by the personal representatives of the deceased, and the recovery to be for the exclusive benefit of the widow and next of kin. The complaint was for an assault and battery with a deadly weapon, and for stabbing with a knife, so that death ensued.

The answer admitted the stabbing and killing, and pleaded *son assault demesne*, and justifiable homicide, in this: That it was committed in the lawful defense of the defendant's person against an assault by the deceased, when there was

reasonable ground to apprehend a design to do some great personal injury, and there was imminent danger of such design being accomplished.

On the trial it appeared that the deceased and defendant were neighbors, and were in the habit of meeting each other, and others of their neighbors, at a small tavern in the vicinity of their residences, and that they thus met on the 7th of February, 1849. The defendant was intoxicated, and the other persons present, of whom there were several, made him the butt and object of a good deal of rough play; pieces of coal and oyster shells were thrown at him; his chair was pulled from under him, and snow cast upon him. The company were very noisy, and pulled each other about, but none of them seemed to be angry. After a while the company began to disperse. Defendant and deceased went out together to go home, and, after they got out of doors, the deceased, in continuance of the rough play, caught hold of the tail of defendant's coat, and pulled him 'round quite rudely. In the scuffle both fell, and, when they arose, the deceased had the skirt of the coat, which had been torn quite off, in his hand. He threw it into the ash hole, where defendant went and recovered it. He then went toward the deceased, and they had some high words, in the midst of which the deceased cried out, "he has stabbed me." In a few moments he fell, and shortly died from the effects of the wound; and it seemed, on examination, that while they were talking together, the defendant drew out his jack-knife and stabbed the deceased.

It was also proved that the deceased was a blacksmith, fifty-six years of age, and was able to earn, at his trade, about twelve dollars a month; and that his family consisted of his wife (the present plaintiff), a daughter about fourteen years of age, and a son twenty-one years of age, who was a cripple, and dependent on his father. He had, in all, six children, but the other four were married, and capable of taking care of themselves. He left no property.

There being no dispute as to the killing, the main question

submitted to the jury was as to the amount of the recovery. It was proved that the defendant was worth about twenty thousand dollars, and had been indicted, though not tried, for the homicide.

*H. Hogeboom*, for plaintiff, claimed that it was a case for vindictive damages, in which the jury would be authorized to give smart money, as well from regard to the extent of the family's loss, as for a punishment for an inexcusable homicide.

*Schoonmaker*, for defendant, insisted that the statute which authorized the action had prohibited vindictive damages, and had established a precise measure of them.

And he also claimed that the action had been prematurely brought, inasmuch as the defendant might be tried for a felony, and the action could not be maintained until he had been tried on a criminal prosecution.

*Edmonds, J.*, overruled the latter objection, on the ground that the Revised Statutes (2 R. S. 292, § 2) had enacted that the right of action of any person injured by any felony shall not in any case be merged in such felony, or be in any manner affected thereby; and he charged the jury, that the fact of the killing in such manner as under the statute would give the plaintiff a right to recover, being established, not merely by the proof, but by the admissions on the record, the only question for their consideration, was the amount of damages which they were to give.

The action was a novel one, and had been unknown to our law for very many years, and when the legislature had authorized it to be maintained, they had evidently been conscious of the danger there was that juries might be misled by their sympathy for the surviving relatives, and by their detestation of the wrongful act, neglect or default, from which death might ensue, and they had therefore been very careful to guard against it. Hence it had been enacted that in such an action the damages should be such as the jury should "deem

fair and just with reference to the pecuniary injury resulting from the death, to the wife and next of kin of the deceased person." (Laws of 1847, ch. 576, § 2.) Such being the rule which the law had laid down for the government of such cases, it was important that it should be well understood and rigidly adhered to.

So far as the punishment of the offender for an inexcusable homicide was concerned, that was provided for by the law in another forum, and in a different form, where public considerations affecting the peace and good order of society, and the protection of human life against wanton violence, could be duly regarded, and might result in the infliction of the highest punishment known to our laws, and it became the jury to beware how they listened to suggestions of vengeance, lest they might be guilty of what our law deems a great wrong — the infliction of double punishment for the same offense.

So, too, as to sympathy with the surviving relatives for whose benefit alone the action was given. It was evidently the intention of the statute that it should find some other vent, some other field for its display, than in the jury box, for it confines the damages to the "pecuniary injury" alone, carefully excluding from view the wounds which the affections may receive from the violent disruption of the ties between husband and wife, or parent and child.

So, too, it would seem that it was the intention to exclude from consideration the question of the defendant's ability to pay; for whether he be rich or poor, it would still be the duty of the jury to take as their unvarying standard, the "pecuniary injury resulting from the death," and that injury is to be "to the widow and next of kin;" not to society at large, nor to any of the numerous smaller communities into which society among us is divided; nor even to the whole circle of relatives; but only to the widow and next of kin, known to our law as such, and who are entitled to the "distribution of personal property left by persons dying intestate."

In fine, the statute intended to reduce the rule of damages, so far as it was capable of being so reduced, to the measure of

dollars and cents, and from that standard the jury were not at liberty, under the statute, to depart.

With all these restrictions, there was still quite a wide field of discretion for the jury, for they were still at liberty to give such damages as they should "deem fair and just in reference to such pecuniary injury."

Beyond these considerations, it would be difficult for the court to aid the jury in establishing a measure of damages. The law had been too recently enacted to enable them to have much benefit from its practical application, or from judicial construction of it, yet it might not be unprofitable to recur to that early age of the law, when it was known to our ancestors, for there they might find some light as to its practical operation.

The judge said that he had indeed discovered the existence on this continent of a custom of paying for life taken, when some twelve or fourteen years ago he had been among the native Indians on our frontiers. But not much aid could be thence derived, because there it had been rather matter of individual compact than of binding law, and was valuable only as showing the effect of the custom to ameliorate the condition of a society where revenge for injuries sustained was inculcated as a duty particularly incumbent on the living for wrongs done to the dead.

It was, however, to the custom as it had obtained among our ancestors, that reference might be made, for it had been known among our Saxon ancestors many hundred years ago, before the introduction of Christianity in the island of Great Britain.

The *weregild* (wergildus) was the price of homicide paid for killing a man; the *pretium redemptionis* of the offender, as the *werelada* was when the price was not paid, but the accused denied his guilt, and purged himself by the oaths of compurgators. The notion of compensation run through the whole criminal law of the Anglo-Saxons, who allowed a sum of money as a recompense for every kind of crime. Every man's life had its value, called a *were* or *capitis estimatio.*

Mary Wise, adm'x, etc., v. Samuel Teerpenning.

This was various, at various times. In the time of King Athelstan, a law was made to settle the *were* of every order of persons in the State. The king was rated at 30,000 thrymsae; a prince or earl at 15,000; an earlderman at 8,000; a thane at 2,000; a common person at 267 thrymsae; the *thrimsa* (Saxon, thrim, three), being a piece of money valued at three shillings, or, according to some, the one-third part of a shilling. When a person was killed the slayer was to make compensation to the relations of the deceased, according to such valuations. In the case of the king, half the *were* went to his relations, and half to his people. If the deceased was a stranger, or had no relations, the *were* was divided; half to go to the king, and half to the most intimate companion of the deceased.

As the manners and notions of the people would not allow them to submit to any harsher punishment in the first instance, it was endeavored to render this as severe as possible. The *were* was not to be remitted; and to make the offender an example, as well as to prevent the effusion of blood, all his relations were, by a law of King Edmund, discharged from the obligation of abetting him against the feud of the relations of the deceased, whose deadly resentment he was to support alone until he paid the *were*.

The degree and circumstances attending the fact, both of which it was out of the power of legislation exactly to reach, made no part of the judicial consideration, but the judge was to award the same stated fine in all cases which could be brought within the letter of the legal description. The Saxons were particularly curious in fixing pecuniary compensations for injuries of all kinds, without leaving it to the discretion of the judge to proportion the amends to the degree of injury suffered.

The object of these laws was to repair the fault, rather than to punish the offender. There was therefore no distinction made between things done with deliberate malice, and those done in the heat of passion, or by inadvertence; a kind of lenity which, however admissible in a rude and simple state

of society, was soon found to be inadequate to the purposes of good government. Other penalties were therefore added, and crimes came to be punished, not merely as private injuries, but as public offenses. Hence an alteration in the law, whereby, in cases of homicide, half the *were* was paid to the king, as *frithbote*, or compensation for the breach of the peace, and half to the family of the deceased, as *maegbote*, literally, compensation to the kindred.

These regulations among our Saxon ancestors, as among the Indian tribes of our continent, had their origin in the desire to regulate and restrain the gratification of private revenge, the strongest passion in an untutored mind, and to curb the principle of retaliation which naturally produced violent and deadly feuds, which for a time broke through the restraints of all government. In cases of homicide, the *were* was thus to redeem the offender from suffering death by the *lex talionis*.

In process of time the laws were so modified that manifest homicide, open robbery, treason, and other crimes were declared to be inexpiable; that is, not to be redeemed by any pecuniary compensation.

The Judge said to the jury, that in referring them to these passages in the history of the English law, he was aware that he might be directing their attention rather to what was curious and entertaining, than instructive to them in the performance of their duty, yet it could scarcely be deemed unwise to refer to the experience of the past, when the jurisprudence of that past was revived in the present, after having slumbered for centuries. Thus it would be observed that several features of the former law were preserved, and incorporated into this new statute; that the fine, or *were*, is payable, not to the government, but to the relatives or family of the deceased; that it is imposed, not as a punishment for a public wrong, but to repair the fault, and compensate the injury of individuals; that in fixing its amount, no respect is paid to the condition of the offender, and that whether rich or poor, high or low, the penalty to be paid by him must be ascertained by other

Mary Wise, adm'x, etc., v. Samuel Teerpenning.

considerations alone; that from those considerations is exclu-
ded all regard to wounded affection on the one hand, or pur-
poses of vengeance on the other; and that the whole penalty
is reduced solely to a pecuniary standard, to be measured now
by the extent of pecuniary injury, as it was formerly by a
fixed and determinate amount in every kindred case.

Aside, however, from this comparison with the past, which
was, nevertheless, so close as to induce the belief that it was
in the view of our legislature, the judge said that it was quite
apparent what was the measure of damage which the statute
intended should govern in such cases, and it was therefore his
duty to instruct the jury that they must adhere closely to the
standard thus given them, and that they would not be at lib-
erty to wander from the narrow path thus pointed out, in
order to indulge their sympathy with the loss which the widow
and the orphans had sustained, or to gratify their vengeance
for a grievous wrong done, or to afford an example to deter
others from like offenses; that they would not even be at lib-
erty to calculate the value of human life at large, but they
were to be confined to the single question, what was its value
to the family of the deceased? So that he who earned for
his family only some $150 a year would necessarily be of less
value, under this statute, than he who earned $1,500; and,
on the other hand, he who earned nothing, but yet was in the
enjoyment of a large income, which on his death would sur-
vive to his family, might, under this statute, be justly deemed
of less value than he would be who earned his half a dollar a
day, and whose family were dependent for support on such
earnings alone.

Such was the standard which the legislature in its power
had established for their government in enforcing this peculiar
statute. Whether wisely, or not, it was not for the court or
jury to say. It was enough for them that so the law was
written, and it would never do for them to depart from its
explicit mandates; least of all, in the pursuit of considera-
tions which the law had carefully excluded from their view.

The Judge said he had been thus full in presenting these

matters to the jury, because he was aware how difficult it was, when estimating the value of human life, to exclude from the view those nameless considerations which tend to enhance that value in a society where life, liberty, and the pursuit of happiness, are secured to every member of the community, and can be forfeited only by crime. Still it was the duty of the jury thus to perform their task, and to right-minded men it would be found not to be impossible thus to perform it.

The jury found a verdict for $1,435.